451 So.2d 808 (1984)
THE FLORIDA BAR, Petitioner,
v.
Rosemary W. FURMAN, d/b/a Northside Secretarial Service, Respondent.
Nos. 63380, 62676.
Supreme Court of Florida.
April 26, 1984.
Rehearing Denied July 11, 1984.
*809 William O.E. Henry, President, Lakeland, Gerald F. Richman, President-elect, Miami, John F. Harkness, Jr., Executive Director, and Catherine L. Dickson, UPL Counsel, Tallahassee, The Florida Bar, and Charles W. Arnold, Jr., Bar Counsel, of Arnold, Stratford & Booth, Jacksonville, for complainant.
William J. Sheppard, Jacksonville, and Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for respondent.
Albert J. Hadeed of Southern Legal Counsel, Inc., Gainesville, for amicus curiae.
PER CURIAM.
The Florida Bar filed petitions charging Rosemary W. Furman, d/b/a Northside Secretarial Service, with engaging in the unauthorized practice of law in the State of Florida, in contempt of this Court's order of November 1, 1979, as reported in The Florida Bar v. Furman, 376 So.2d 378 (Fla. 1979), appeal dismissed, 444 U.S. 1061, 100 S.Ct. 1001, 62 L.Ed.2d 744 (1980). The charges were assigned to a referee and a report returned for our consideration. We have jurisdiction under article V, section 15 of the Florida Constitution and The Florida Bar Integration Rule, article XVI.
A brief recitation of the prior history of this case is necessary. Respondent Furman is not and never has been a member of The Florida Bar (Bar) and is not licensed to practice law within this state. In 1977, the Bar filed petitions with this Court alleging that respondent had engaged in the unauthorized practice of law by giving legal advice and by rendering legal services in connection with marriage dissolutions and adoptions in the years 1976 and 1977. More specifically, the Bar alleged that respondent performed legal services by soliciting information from customers and by preparing legal pleadings for them in violation of Florida law and that, through advertising, respondent held herself out to the public as having legal expertise in Florida family law. We appointed a referee to receive evidence and to make findings of fact, conclusions of law, and recommendations as to the disposition of the case. In due course the referee submitted findings that respondent had engaged in the unauthorized practice of law and recommended that she be adjudged guilty of contempt of this Court. We found respondent guilty and permanently enjoined and restrained her from further engaging in the unauthorized practice of law, as specified, but did not find her guilty of contempt.
On September 28, 1982, and March 9, 1983, the Bar filed petitions alleging six and ten instances, respectively, wherein respondent had continued her unauthorized practice of law in contempt of this Court's order. We issued rules to show cause on November 30, 1982, and March 21, 1983, respectively, and appointed a referee to receive evidence and to make findings of fact, conclusions of law, and recommendations. The referee conducted pretrial hearings, consolidated the rules, and set evidentiary hearings for June 20 and 21, 1983. On June 20, 1983, we denied respondent's motions for a stay of the proceedings and for trial by jury. Respondent chose not to testify at the evidentiary hearings. The uncontradicted testimony of former customers of respondent was that she advised *810 them to falsify information in marriage dissolution papers and to conceal relevant information from the courts acting on the dissolution petitions. Her purported reasons were various: it's none of their damn business, they don't pay any attention to the information, or you'll (either) get less or give more money in the dissolution judgment. In one instance, respondent advised a wife who had been married, divorced, and remarried to the same husband but could not remember the date of the remarriage to insert the date of the dissolved first marriage as the date of the second marriage in the petition for dissolution. Another couple who disagreed on whether their stipulation on child custody provided for $35 per week or $35 per child was advised that it didn't matter because the judge awarded whatever he wanted to anyway. In a particularly egregious instance, respondent assisted a husband seeking a marriage dissolution in preparing a stipulation in which he agreed to child custody by the wife. While the dissolution petition and child custody stipulation were pending before the court, the husband became aware that the wife was abusing the children, took actual custody of the children, and consulted respondent about withdrawing his stipulated agreement on child custody. Respondent advised him not to do so because this would require "starting over" on the dissolution petition and he should let the social agency (HRS) handle the child abuse and custody problem.
At the conclusion of the evidentiary hearings, the referee scheduled briefing and the case was orally argued on August 15, 1983. Both parties were given an opportunity thereafter to submit proposed orders for the referee's consideration. On September 28, 1983, the referee set a hearing for October 10, 1983, to announce his findings and recommendations and to hear arguments in aggravation or mitigation, if appropriate. At the beginning of the hearing, the referee distributed draft copies of his prospective order and announced the highlights of the order from the bench. The draft recommended that respondent be held in indirect criminal contempt and that she be sentenced to unspecified terms of imprisonment. The referee then offered respondent an opportunity to present evidence and argument in mitigation and recessed the hearing for a short time to permit respondent to consider her options. Respondent chose not to testify or present evidence, but joined the Bar in presenting arguments, after which the referee entered the order under consideration. The order recommended concurrent four-month sentences in state prison.
Respondent raises five objections to the referee's report. She initially argues that she was entitled to a jury trial under both the sixth amendment and the due process clause of the fourteenth amendment, United States Constitution. This argument fails for the following reasons. These original proceedings were conducted under The Florida Bar Integration Rule, article XVI, which provides that the punishment for indirect criminal contempt shall not exceed a fine of $2,500 or imprisonment of up to five months or both. On sixth amendment grounds, respondent urges that she was potentially subject to five months' imprisonment and a fine of $2,500 for (a) each of the sixteen alleged instances of unauthorized practice of law, or for (b) each of the two rules, charging indirect criminal contempt. It is respondent's position that these potential punishments were so severe that they entitled her to a jury trial. In addition, respondent urges that the potential punishment of imprisonment and a fine of $2,500 for even a single conviction was sufficiently severe to entitle her to a jury trial. Further, she also argues that any potential fine above $500 entitled her to a jury trial. In support of her position, respondent cites a cornucopia of federal case law which she asserts supports her position. We disagree. First, as to whether it is the potential or actual punishment that determines the seriousness of the offense and the right to a jury trial, the United States Supreme Court has held that "our cases hold that petty contempt like other petty criminal offenses may be tried without a jury and that contempt *811 of court is a petty offense when the penalty actually imposed does not exceed six months or a longer penalty has not been expressly authorized by statute." Taylor v. Hayes, 418 U.S. 488, 495, 94 S.Ct. 2697, 2701, 41 L.Ed.2d 897 (1974) (emphasis supplied) (citations omitted). Respondent asserts that a longer penalty is expressly authorized by the Integration Rule, article XVI, and that she is thereby entitled to a jury trial. Respondent overlooks Aaron v. State, 284 So.2d 673 (Fla. 1973). In Aaron, we recognized that Florida law theretofore had permitted the judge to be trier of both the law and facts and to impose punishments of greater than six months for criminal contempt. In order to reconcile Florida law with United States constitutional law, we held that all provisions of Florida law authorizing the judge to be the trier of both law and facts were limited to situations in which the judge contemplated, if a finding of guilt be made, the imposition of a sentence of six months or less and, further, that when a court denied a pretrial motion for trial by jury it could not thereafter impose a sentence greater than six months. Id. at 676-77. Our constitutional holding in Aaron reduces all criminal contempt offenses to petty offenses when the judge acts as trier of fact and law, barring waiver of the right to jury trial by the respondent, and reduces or restricts the punishment for criminal contempt, potential or actual, to that which may be imposed for petty criminal offenses. The Aaron holding is consistent with Taylor, 418 U.S. at 496, 94 S.Ct. at 2702, where the Court upheld the power of a state appellate court to obviate the right to a trial by jury by reducing a contemnor's sentence to six months or less rather than retrying the contempt with a jury. As applied here we note (1) that we earlier denied respondent's motion for a jury trial, thereby bringing the Aaron rule into play; (2) that the actual recommendation of the referee is for two concurrent sentences of four months' imprisonment without a fine, and that this is permitted by Aaron and Taylor; and (3) that in a proceeding such as this, it is this Court that imposes the sentence, not the referee, and we have the power, as in Aaron and Taylor, to reduce sentences as necessary to meet constitutional imperatives. We also reject respondent's contention that a potential fine of more than $500 is itself severe enough to entitle her to a jury trial. It is the actual fine imposed by the state not the potential fine which controls. Here, there is no actual fine. We note, further, that the Court in Muniz v. Hoffman, 422 U.S. 454, 477, 95 S.Ct. 2178, 2190-91, 45 L.Ed.2d 319 (1975), expressly rejected the contention that "a contempt must be considered a serious crime under all circumstances where the punishment is a fine of more than $500, unaccompanied by imprisonment." Id. The Court there upheld a $10,000 fine imposed upon a labor union. Neither party has cited us to a case where either this Court or the United States Supreme Court has held that the amount of a fine, potential or actual, transforms a petty offense into a serious offense. We are not ourselves aware of any such case and are not faced with the issue here. We decline to adopt such a rule in obiter dictum.
On the issue of a sixth amendment right to trial by jury, respondent also argues that we should consider the collateral consequences of our holding her in contempt of court for continuing the unauthorized practice of law. Respondent's point appears to be that she will not be able to continue her current business practices and will lose her livelihood. The loss of her livelihood, if such is the case, is unfortunate, but the fact of the matter is that she has no right to practice law without a license or to disobey this Court's injunction.
Respondent also argues that she has a right under the due process clause to be tried by a jury of her peers because the referee, the Bar and its members, and all Florida judges, have, or appear to have, a pecuniary interest in this case. We reject this argument for two reasons. First, any pecuniary interest that individual judges or lawyers have in preventing respondent from practicing law is so minuscule as to be unidentifiable. City of Tallahassee v. *812 Florida Public Service Commission, 441 So.2d 620 (Fla. 1983). Indeed, based on the uncontradicted evidence from certain of her former customers that they had to retain attorneys in order to resolve problems arising from respondent's services, it may well be that respondent adds to the work load of properly licensed lawyers and judges by her unauthorized and maladroit attempts to practice law. Second, the general thrust and effect of her argument is that the state cannot use its legal system to regulate the practice of law or prohibit the unauthorized practice of law. The more specific thrust and effect of her argument is that respondent is above the law because she has anointed herself as the nemesis of the state's legal system. We reject both the general and the specific proposition as meritless.
Respondent's second objection is that the referee upheld an erroneous legal standard in determining whether respondent violated this Court's injunction. The gist of respondent's argument is that our order enjoining respondent, which incorporated The Florida Bar v. Brumbaugh, 355 So.2d 1186 (Fla. 1978), is unclear as to what activities are enjoined and that the referee adopted an unreasonably expansive reading of the injunction in making his findings. In considering respondent's argument, we follow the rule that the referee's findings must be approved unless they are erroneous or wholly lacking in evidentiary support. Furman, 376 So.2d at 381; Florida Bar v. Wagner, 212 So.2d 770 (Fla. 1968). In Furman, we relied on and quoted at length from Brumbaugh, a case involving a similar secretarial business, in order to determine whether respondent's activities warranted an injunction restraining her from the unauthorized practice of law, as the referee had recommended. Drawing from that extended quote, we extract only that portion dealing with enjoined activities:
[Respondent] must not, in conjunction with her business, engage in advising clients as to the various remedies available to them, or otherwise assist them in preparing those forms necessary for a dissolution proceeding. More specifically, [respondent] may not make inquiries nor answer questions from her clients as to the particular forms which might be necessary, how best to fill out such forms, where to properly file such forms, and how to present necessary evidence at the court hearings. Our specific holding with regard to the dissolution of marriage also applies to other unauthorized legal assistance such as the preparation of wills or real estate transaction documents. While [respondent] may legally sell forms in these areas, and type up instruments which have been completed by clients, she must not engage in personal legal assistance in conjunction with her business activities, including the correction of errors and omissions.
Furman, 376 So.2d at 381, quoting Brumbaugh, 355 So.2d at 1194. We then noted:
Before the referee and before this court, Furman admitted that she did not abide by the dictates of Brumbaugh. She says that it is impossible for her to operate her "do-it-yourself divorce kit" business in compliance with this court's ruling in that case. The bar alleges that Furman has engaged in the unauthorized practice of law as previously defined by this court. The referee so found. She so admits. We believe the referee's findings are supported by the evidence.
Furman, 376 So.2d at 381. We repeat now what we said then: "Our directions could not have been clearer." Id. Respondent's contention that her activities were premised on a good-faith but erroneous interpretation of a vague and nonspecific order of this Court is totally meritless. Respondent's claimed uncertainty about the nature and contents of our injunction appears to arise from a deliberate and intentional misapprehension of the effect of an injunction and the nature and posture of this case. In their briefs, respondent and amicus curiae (Southern Legal Counsel, Inc., which formerly represented respondent), have favored us with dissertations on what should or should not constitute the unauthorized practice of law and what measures this *813 Court should initiate in order to provide free legal services in civil proceedings. Respondent's brief, for example, asserts that "[w]hat has been at issue in both the prior proceedings and in this case is whether [respondent's] activities constitute the unauthorized practice of law." Not so. We are not here, in this instance, to consider the broad questions of what constitutes the unauthorized practice of law or what, if any, free legal services should be provided in civil actions. We are also not here to revisit Brumbaugh or Furman in order to determine whether the guidance and strictures therein should be amended. Had respondent initiated a motion before this Court requesting that we reexamine Brumbaugh and Furman, and perhaps modify the terms of our injunction, we would have considered such motion and the arguments presented on their merits. This is not the posture of the case. Respondent has been brought before this Court on charges of violating the terms of an earlier injunction and will not be permitted to reargue the merits of whether the injunction should have been issued. As we said long ago:
An injunction or restraining order must be obeyed until vacated or modified by the court awarding it, or by superior authority, or until the order or decree which granted it has been reversed on appeal, no matter how unreasonable and unjust the injunction may be in its terms, and no matter how flagrantly the rules of equity practice have been violated by the court in ordering it to issue.
Seaboard Air Line Railroad v. Tampa Southern Railroad, 101 Fla. 468, 477, 134 So. 529, 533 (1931). See also Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); Howat v. Kansas, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550 (1922).
We turn then to the referee's findings that respondent contemptuously continued the unauthorized practice of law in violation of our injunction. The referee found in pertinent part:
J. Ms. Furman prepared pleadings that went beyond just transposing information from an intake sheet to a form. She articulated that information in a fashion which raised justiciable issues regarding child custody, child support, division of property.
K. Ms. Furman explained legal remedies and options to litigating parties which affected the procedural and substantive legal rights, duties, and privileges of those parties.
L. Ms. Furman construed and interpreted the legal effects of Section 61.13, Florida Statutes, pertaining to shared parental responsibility.
M. Ms. Furman gave advice on how to construct and prepare a financial picture that would result in increased monetary benefits or decreased monetary obligations as the case may be for the one seeking her advice, without regard for the truth, in some instances.
N. Ms. Furman, as part of her comprehensive legal assistance, gave advice and direction on how and where to file documents with instructions on how to technically prepare and litigate the case in Court.
O. Ms. Furman was available to her customers to correct erroneous or legally deficient pleadings that she had prepared, and to remedy problems experienced by her customers during the dissolution hearing which otherwise frustrated a conclusion thereto.
P. Ms. Furman professed to her customers to have knowledge of the weight and credibility that judges attach and give to legal documents and crucial legal information and evidence.
Q. Ms. Furman participated in oral dialogues with her customers regarding such issues as money for the support of children, safety of children from abusing parents, the placement of children with the most deserving parent, available remedies and options *814 for litigating parties, her interpretation and understanding of legal documents and pertinent statutes, the financial status of husbands and wives as they bore on their need or ability to receive or pay, the ability of her customers to comply with financial Court-ordered obligations, the importance of Court orders and complications therewith, and corrective procedures for defective dissolution proceedings.
R. Ms. Furman, in each case, was paid a monetary fee ranging up to $100.00.
Of the sixteen alleged instances of unauthorized practices of law, four were nolle prossed by the Bar. The referee's findings were based on a case-by-case examination and analysis of the twelve instances where evidence of unauthorized practice of law was introduced. The evidence consisted of the testimony of the customers involved in the specific instance and relevant documents or forms that respondent had prepared for the customer. This evidence was almost entirely uncontradicted except for cross examination. We have reviewed the findings on these twelve charges and find that they are supported by the evidence. We find no error and approve the findings of the referee.
Respondent's third objection is that the referee improperly rejected the defense of laches regarding four alleged instances of the unauthorized practice of law. Three of the four instances are at issue; the fourth was nolle prossed. It is uncontroverted that the Bar knew of these three reported instances when it filed its first petition with this Court in September, 1982, but chose to withhold them at that time. These three instances were later included in the second petition of March, 1983. Respondent's position is that she routinely destroyed material from her files concerning these earlier alleged instances and that she was prejudiced in her defense by not having the material available to show that the customers prepared "intake forms" from which she prepared legal forms. The Bar counters that although it knew of the reported instances in September, 1982, it had not completed its investigation at that time and was not prepared to go forward with the charges. Laches is an affirmative defense which must be pleaded and proved by clear and positive evidence. Van Meter v. Kelsey, 91 So.2d 327 (Fla. 1956). The referee considered respondent's evidence on laches and found it insufficient to prove the defense. We agree. The evidence produced by the Bar on these three instances consisted of the testimony of the customers showing that respondent had orally interviewed them and advised them on various legal points contrary to this Court's order enjoining such activities. The preparation of intake forms could not have obviated the contemptuous conduct.
Respondent's fourth objection is that the referee erred in failing to dismiss the second rule to show cause because of procedural irregularities. Reports of the unauthorized practice of law are investigated and disposed of in accordance with Integration Rule, article XVI. Local committees are established throughout the state to receive and investigate such reports and to forward them to The Florida Bar for further investigation, processing, and disposition. There is also a Standing Committee on Unauthorized Practice of Law which functions statewide to oversee the local committees and perform various other duties. These duties include submitting recommendations to the Bar's Board of Governors on instituting litigation, supervising such litigation, and conducting investigations of unauthorized practice on its own behalf or in concert with local committees. The charges contained in the first petition or rule were investigated by the local committee, forwarded to the Standing Committee, considered and approved by the Standing Committee, and a recommendation made to the Board of Governors that litigation be initiated. The Board of Governors approved the litigation and the chairman of the Standing Committee prepared and signed a petition to this Court which commenced the litigation against respondent. *815 The respondent does not contest the propriety of the procedures followed in filing the first petition or that the litigation was properly initiated. Respondent contends, however, that these procedures were not followed in the second petition and, for that reason, the second petition should have been dismissed. More specifically, respondent argues that the petition was not investigated by the local committee. Article XVI authorizes the Standing Committee to investigate the unauthorized practice of law either on its own or in concert with local committees. There is no requirement either in article XVI or in logic to require that all investigations be first conducted by the local committee. This is particularly so, when, as here, initial charges have been investigated and considered by the local committee, and the Standing Committee is engaged in an ongoing investigation and in supervising litigation which has already been initiated against the particular respondent.
Respondent also argues that the second petition was filed by the chairman of the Standing Committee prior to its approval by the Standing Committee and the Board of Governors. This argument is also without merit. The petition for the second rule, signed as was the first petition by the chairman of the Standing Committee, was filed with this Court on March 9, 1983. The petition was approved by the Standing Committee on March 11 at its meeting and thereafter by the Board of Governors. We did not act on the petition until March 21. Although it would have been preferable as a matter of procedural rectitude had the Standing Committee and Board of Governors approved the petition before it was actually filed, we note that litigation against respondent had been properly approved beforehand, the second petition was in the nature of an amendment to the earlier charges, and approval of the Standing Committee, and presumably the Board of Governors, was obtained prior to our acting on the petition on March 21. We are satisfied that respondent was afforded due process and that the claimed improprieties are inconsequential.
The respondent's fifth objection to the referee's report is that the referee decided on the sentence before hearing respondent's evidence in mitigation. Respondent's point is that the referee came to the hearing on October 10, 1983, with a draft of a prospective order recommending imprisonment, and the contents of this draft order indicated that he was rejecting in advance any argument that might be made in mitigation. Respondent concedes that she was given the opportunity to present evidence in mitigation, but asserts that she declined to do so because of her perception that the referee, like all judges, was biased, and, therefore, it would have been pointless. Respondent's contentions are meritless. Extensive hearings had been conducted prior to the hearing on October 10, 1983. That hearing was for the purpose of announcing the referee's findings on the merits of the case and to provide the parties the opportunity to present evidence in mitigation or aggravation in the event the referee recommended a finding of contempt. Both parties had been given an opportunity to present proposed findings and were on notice of the purpose of the hearing. Predrafted orders are commonplace, and under the circumstances it was not unusual or improper for the referee to have such an order on hand at the beginning of the hearing. Respondent was given an opportunity to consider her options, did so, and chose not to testify or present evidence in mitigation. Having voluntarily waived the right to present such evidence to the referee and this Court, respondent cannot now complain that it would have been rejected anyway. Respondent's assertions have no legal merit.
Turning to the referee's recommendations, we approve the findings that respondent has violated the terms of our order enjoining and restraining her from performing the specific acts therein prohibited. We hold her in contempt of court. We, however, do not accept the referee's recommendation that she be imprisoned in the state prison for two concurrent four-month *816 terms. Under the facts of this case, we find it more appropriate to sentence respondent to the Duval County jail for a single term of 120 days. We suspend 90 days of the 120-day term of imprisonment. When this opinion becomes final, the sheriff of Duval County is authorized and directed to take respondent into custody and to imprison her for 30 days. If respondent does not violate the terms of our continuing injunction for a period of two years, the suspended term of 90 days shall be deemed satisfied.
The terms and provisions of our previous order permanently enjoining and restraining respondent remain in effect.
Costs of these proceedings are taxed against the respondent, Rosemary Furman.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, EHRLICH and SHAW, JJ., concur.
OVERTON, J., concurs specially with an opinion.
McDONALD, J., concurs with an opinion, in which EHRLICH, J., concurs.
OVERTON, Justice, specially concurring.
I fully concur with the majority opinion.
Ms. Furman's "clerical service" is a profit-making enterprise. She has not just prepared forms for a fee; the uncontroverted evidence reflects that she has advised her customers to take actions that were contrary to their best interests and, even more egregious, has advised her customers to provide the court with false or misleading information. This conduct not only constitutes the unlawful practice of law but it also corrupts the judicial process. If Ms. Furman were a lawyer, this conduct would be a serious disciplinary offense that could lead to disbarment.
Without question this Court should do everything possible to assure that the courts are both available and affordable to all segments of the public, but that does not mean that we should allow Ms. Furman's service to continue in the manner in which she has operated it. Allowing this type of conduct to exist unchecked will not solve the problem of providing proper legal services to those with limited incomes.
Although much remains to be done, this state is aggressively moving forward in providing legal services in civil cases through simplified procedures and expanding legal aid and legal referral services, in addition to establishing a procedure to obtain funds for these legal aid services through interest on lawyers' trust accounts.
In this case there is no question that Ms. Furman has gone much further than assisting her customers in filling out the forms. The record conclusively reflects that she has willfully violated this Court's order.
McDONALD, Justice, concurring.
There are many professions and businesses that are regulated by law. E.g., chs. 456-468, Fla. Stat. Most of these are supervised by the Department of Professional Regulation. The Florida Constitution, article V, section 15, and chapter 454, Florida Statutes, however, have granted to The Florida Supreme Court the power and authority to govern and regulate admissions of attorneys. Whatever the business or profession, the underlying policy of regulation is to protect the public and assure that those performing certain tasks are qualified to do so. Attendant to such regulation is the discipline and assessment of penalties for those who trespass into a field of service for which they are not qualified. In the case of the unauthorized practice of law that responsibility rests with this Court.
It was in this setting that we first met Ms. Furman in 1979. The Florida Bar v. Furman, 376 So.2d 378 (Fla. 1979). The Court analyzed activities in which she was involved and determined them to be the unlawful practice of law. It was not claimed at that time that anyone had been injured by her conduct, but the likelihood of legal injury occurring, should her conduct persist, was manifest. Hence, we enjoined her from certain conduct which we *817 determined to be the unauthorized practice of law. An injunction is an order directed to a person to either cease doing something that is presently being done or else to do a certain thing. Such an order must be clear and concise. Ms. Furman's was.
Once a valid court order is entered, its violation may result in criminal contempt. We are a nation of laws and are expected to follow the directions of judicial orders. Otherwise court orders would have no meaning, and mass refusal to follow such orders could result in anarchy. The right, and the will, to enforce valid court orders is not only proper, but mandated. The legislature recognized this by enacting sections 38.22 and 38.23, Florida Statutes (1983), specifically authorizing the courts to punish for contempt.
We have promulgated a rule for general indirect criminal contempt, Florida Rule of Criminal Procedure 3.840. We have also promulgated a specific rule for an indirect contempt proceeding where the complaint is the unauthorized practice of law, Florida Bar Integration Rule, article XVI. Each contains constitutional safeguards  a concise charging document, a hearing with an opportunity to confront witnesses, an opportunity to reply to the charges, and the opportunity to show mitigating circumstances. A jury trial is not necessary, but the trier of fact must be satisfied of guilt beyond a reasonable doubt. Under the Bar rule punishment is limited to a five-month incarceration and a fine of $2,500. Ms. Furman was tried pursuant to this rule, and the circuit judge, sitting as a referee, found her guilty.
Ms. Furman chose not to present any evidence, and one has to suppose what her defenses, other than the procedural claim of a right to a trial, are. Can it be said that this Court's original order was vague or impossible to understand and comply with? Is the subject of the order a matter over which this Court has no jurisdiction? Was the proof of guilt wanting? Were there any state or federal constitutional impediments to the original order on these proceedings? The answer to all of these questions is no.
Ms. Furman's motives were commercial in nature. Her business is not to help the poor, as some questioners of this proceeding suggest, but to earn dollars. Her acts of disregarding this Court's order appear intentional. The inevitable result is a mandated finding of guilt for pursuing a course of conduct that violates an order of this Court prohibiting the unauthorized practice of law. I concur, therefore, in the majority's finding Ms. Furman in indirect criminal contempt of court.
EHRLICH, J., concurs.